IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| | | Case No. 3:09cr180(1-3) |
| vs. | : | |
| | | JUDGE WALTER HERBERT RICE |
| DAMMON McGUIRE, et al., | : | |
| Defendants. | : | |

DECISION AND ENTRY OVERRULING DEFENDANTS' MOTIONS TO
SUPPRESS IDENTIFICATION TESTIMONY (DOCS. ##28, 32 AND 53)

Defendants Dammon McGuire ("McGuire"), Brian Woods ("Woods") and
Turrell Justice ("Justice") are charged in the Second Superseding Indictment
(Doc. #42) with a number of drug, weapons and other offenses.  Those offenses
stem from a home invasion which occurred on March 17, 2009.  The three victims
of the home invasion, Brian Pinson, Okeretta Barnett ("Barnett") and Breonna
Pinson, each identified one or more of the Defendants.[1]  In particular, Brian Pinson
and Barnett identified McGuire from identical photo arrays shown to them on
March 19, 2009; all three victims of the home invasion identified Woods from

---

[1]There was an additional, fourth victim of the home invasion, a 10-year-old male
identified as the son of Brian Pinson and Barnett.  In absence of evidence that he
identified any of the Defendants as having been involved in the home invasion, the
Court does not discuss him further.

identical photo spreads shown to them on separate dates during January, 2010,

and Brian Pinson identified Justice during a "show-up" identification procedure

conducted the evening of the home invasion.  The Defendants have moved to

suppress such identifications.  See Doc. #28 (McGuire's Motion to Suppress

Identification Testimony); Doc. #32 (Woods' Motion to Suppress Identification

Testimony); and Doc. #53 (Justice's Motion to Suppress Identification Testimony).

On August 25, 2010, this Court conducted an oral and evidentiary hearing on the

Defendants' motions.  The parties have filed their post-hearing memoranda (see

Docs. ##62, 63, 64 and 65), and the Court now rules on the Defendants' motions,

beginning by reviewing the facts that were established during the suppression

hearing.

During the evening of March 17, 2009, Brian Pinson, whom the Government

refers to as a known drug dealer, returned to his residence located at 5728

Westcreek Drive, Trotwood, Ohio.  After parking his car in the driveway, he was

walking up to the front porch of that residence, when he heard a noise behind him

and turned to see three males with firearms standing behind him, in single file, one

behind the other.[2]  The three individuals were not disguised, and their faces were

visible.  Brian Pinson was able to look at the faces of the three individuals.  The

first of the individuals whom Brian Pinson observed was short and heavy-set with a

beard and his hair in braids.  The second individual was taller than the first, but

---

[2]It was dark when Brian Pinson was confronted by the three individuals.

shorter than the third.  The third individual was not only the tallest, but also slim in stature.[3]

The first individual asked Brian Pinson who was home.  He replied that he did not know.  Since he did not have his key to his residence, Brian Pinson rang the doorbell.  His daughter, Breonna Pinson, answered the door.  The three individuals then followed Brian Pinson into the residence.[4]  Once inside, the first individual, the one with braided hair, moved around Brian Pinson, who had complied with the directive to lie face down at the base of the steps, and proceeded up the steps to the second floor of the residence with Barnett.  Brian Pinson was able to look at that person's face as he proceeded up the stairs.  The third individual, the tallest and the one carrying the rifle, stood over Brian Pinson, as he was lying face down. He could see his daughter and son being escorted into another room, by one of the home invaders.  In addition, when the first individual came back down the stairs with Barnett, Brian Pinson was able to once again see his face.

Shortly after the first individual and Barnett had walked down the stairs, the doorbell to the residence rang, and Brian Pinson heard the three home invaders exclaim that it was the police.  After he heard the three leave his residence, Brian Pinson got up, gathered his children and walked out to the front porch with them, where they were met by police officers.  The officers moved them toward the driveway.

_____

[3]The third individual was carrying a rifle, while the other two were armed with handguns.

[4]Since his back was to them, Brian Pinson did not, at that time, have the opportunity of looking at them.

At some point thereafter, Brian Pinson saw the individual with braided hair, who is referred to above as the first individual, standing in the doorway to his (Brian Pinson's) residence.  After police officers told the individual with braided hair to leave the residence, that individual slammed the door and disappeared inside that residence.  At that point, Brian Pinson was able to observe that individual's face.

Later, some thirty minutes to an hour after the home invasion, a marked police cruiser arrived at Brian Pinson's residence.  An officer directed Brian Pinson to the rear of the cruiser and shined a flashlight into the cruiser.  Brian Pinson looked into the police vehicle and saw an individual lying on the back seat therein. He could see the entire side of the individual's face and identified him as the first of the home invaders, the individual with braided hair.  That individual was later identified as Defendant Justice.

Thereafter, Rick Bergman ("Bergman"), a detective with the Montgomery County Sheriff's Department assigned to the FBI, Miami Valley Safe Streets Task Force, developed information, in conjunction with the FBI, that McGuire may have been involved in the home invasion.  As a consequence, Bergman assembled a photographic array consisting of six pictures, one of which was McGuire's.[5]

To accomplish that end, Bergman utilized a Montgomery County database, called JusticeWeb.  That database allows an officer to view the photographs of individuals who share physical characteristics with the suspect.[6]  From those photographs, an officer will select five individuals who possess like and similar

_____

[5]Such a photographic array is commonly referred to as a "six pack."

[6]The characteristics include weight, height, age and race.

- 4 -

characteristics to the suspect. Herein, Bergman used that protocol to select

photographs of five individuals he believed had similar facial features, hair and the

like to McGuire. Once Bergman had selected the five photographs which would be

shown with McGuire's in the photo spread, JusticeWeb randomly placed McGuire's

photograph among the other five. Indeed, Bergman did not have any control over

the placement of the six photographs. The photograph of McGuire was the third

photo shown on the array. Bergman then printed the photographic array in black

and white.

On March 19, 2009, two days after the home invasion, Bergman traveled to

the victims' residence at 5728 Westcreek Drive, in order to show each of them the

array containing a photo of McGuire. Bergman, who was accompanied by FBI

Special Agent Timothy Ferguson ("Ferguson"), initially separated the three victims,

Brian Pinson, Barnett and Breonna Pinson, moving each into a well-lit area of the

residence, where he or she could view the photo spread in privacy without

informing the others that he or she had identified one of the invaders. Initially,

Bergman, without Ferguson, met with Barnett. Before showing her the

photographic array, Bergman read Barnett the following statement which is printed

on the array:

> "I am going to show you a group of photographs. This group of photographs
> may or may not contain a picture of the person who committed the crime
> now being investigated. Keep in mind that hairstyles, beards and mustaches
> may be easily changed. Also photographs may not always depict the true
> complexion of a person. It may be lighter or darker than shown in the photo.
> Pay no attention to any markings or numbers that may appear on the photos
> or any differences in the type or style of photographs. When you've looked
> at all the photos, tell me whether or not you see the person who committed
> the crime. Do not tell other witnesses that you have or have not identified
> anyone."

- 5 -

Transcript of August 25, 2010 Hearing (Doc. #59) at 27-28.  After she had viewed the array, Barnett indicated that she was 75% certain that the person shown in the third photograph, McGuire, had been one of those who had invaded her residence. She so indicated by circling McGuire's photograph on the photo spread and writing "75%" next to it.[7]  She also signed the array.  When Barnett was shown the array, Bergman did not point to or otherwise attempt to identify McGuire's photograph. Bergman did not inform Barnett that she had identified a person whom the police believed had been involved in the home invasion.  He also cautioned her not to discuss matters with any of her family members.

Bergman then met with Brian Pinson in a separate area of the residence.[8] Bergman read him the same statement he had read to Barnett and, then, showed the array to him.[9]  Like Barnett, Brian Pinson identified the individual shown in the third picture, McGuire, as being one of the home invaders.  As he had with Barnett, Bergman did not did not point to or otherwise attempt to identify McGuire's photograph or to inform Brian Pinson that he had identified a person whom the police believed had been involved in the home invasion.  Brian Pinson circled the photograph he had selected and signed the array.  Bergman also cautioned Brian Pinson not to discuss matters with any of his family members.[10]

---

[7]A copy of the photographic array shown to Barnett is Government Exhibit 2.

[8]Since Barnett and Brian Pinson had been placed in separate areas of their residence, they did not have the opportunity to interact before Bergman showed Brian Pinson the photo spread.

[9]A copy of the photographic array which Bergman showed to Brian Pinson is Government Exhibit 1.

[10]Bergman also showed the photographic array containing McGuire's picture to Breonna Pinson who did not identify any of the six persons whose pictures

- 6 -

The evidence established that neither the photographic array containing McGuire's picture nor the manner in which it was shown to Barnett and Brian Pinson was unduly suggestive.  The Defendant McGuire has failed to sustain his burden of proof on this issue.

In January, 2010, officers developed information that Woods had been involved in the home invasion.  As a consequence, using the JusticeWeb database and the same procedures he had utilized to develop the photo spread containing a picture of McGuire, Bergman developed a photographic array of six pictures, including Woods, to show the victims of the home invasion.  As with the photographic array for McGuire, JusticeWeb selected the position of Woods' photograph in the array.  Woods picture is photo numbered three on the array.

On January 19, 2010, Bergman traveled to the residence at 5728 Westcreek Drive, where he met Brian Pinson.  Following the same protocol he had utilized when he had shown the photographic array containing the photo of McGuire, Bergman initially read Brian Pinson the cautionary statement which is printed on the bottom of the array and is quoted above.  Bergman then showed the photographic array[11] to Brian Pinson, who identified the individual whose photo was numbered three on the array, i.e., Woods, as having been involved in the home invasion.  Brian Pinson circled that photo and signed the array.  Bergman did not indicate to Brian Pinson that he had selected an individual whom police officers

_____

appeared thereon as having been involved in the home invasion.  In addition, Bergman showed each of the three victims a photographic array, containing a picture of Tashan Justice, Justice's brother.  None of the three identified Tashan Justice as having been involved in the home invasion.

[11]A copy of the photographic array containing Woods' photo, which was shown to Brian Pinson, is Government Exhibit 3.

- 7 -

suspected had been involved in the home invasion, nor did he in any manner signal to Brian Pinson that he should select photo numbered three. Before leaving, Bergman once again cautioned Brian Pinson not to discuss the procedure with his family members. Brian Pinson followed that instruction.

Due to scheduling difficulties, Bergman was not able to meet with Barnett and Breonna Pinson on January 19th. As a consequence, he traveled to their residence on January 26, 2010, to meet with Barnett, and on January 27, 2010, to meet Breonna Pinson, in order to show them the photographic array containing Woods' photograph. Bergman met separately with those two victims. At those meetings, Bergman read each of them the above-quoted cautionary language, before showing the array to each.[12] Each of them identified the individual whose photo was numbered three on the array, i.e., Woods, as a person who had been involved in the home invasion, circled and initialed that photo and signed her respective copy of the photographic array. Bergman did not indicate to either that they had selected a person whom police believed had been involved in the home invasion, nor did he in any manner signal to either that she should select photo numbered three. Before leaving, he once again cautioned each of them not discuss the procedure with anyone. Neither has discussed it.

The photographic array containing the picture of Woods and the manner in which that array was shown to the three victims was not unduly suggestive. The Defendant Woods has failed to sustain his burden of proof in that regard.

_____

[12]A copy of the array containing Woods' photograph which was shown to Barnett is Government Exhibit 5, while that shown to Breonna Pinson is Government Exhibit 4.

In Ledbetter v. Edwards, 35 F.3d 1062 (6th Cir. 1994), cert. denied, 515

U.S. 1145 (1995), the Sixth Circuit restated the standards which are applicable to

a request to suppress witness identification testimony:

> A conviction based on identification testimony that follows a pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification procedure is so "'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" Thigpen v. Cory, 804 F.2d 893, 895 (6th Cir. 1986), cert. denied, 482 U.S. 918 (1987) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).  It is the likelihood of misidentification that violates the defendant's due process right.  Neil v. Biggers, 409 U.S. 188, 198 (1972).  The due process concern is heightened when that misidentification is possible because the witness is called upon to identify a stranger whom she has observed only briefly, under poor conditions, and at a time of extreme emotional stress and excitement.  See Manson v. Brathwaite, 432 U.S. 98, 112 (1977); Simmons, 390 U.S. at 383-84; United States v. Russell, 532 F.2d 1063, 1066 (6th Cir. 1976).
>
> In assessing the validity of a pretrial identification, this court follows a two-step analysis.  The court first considers whether the procedure was unduly suggestive.  Thigpen, 804 F.2d at 895.  The defendant bears the burden of proving this element.  United States v. Hill, 967 F.2d 226, 230 (6th Cir.), cert. denied, 506 U.S. 964 (1992).  If the court does find that the procedure was unduly suggestive, it next evaluates the totality of the circumstances to determine whether the identification was nevertheless reliable [i.e., whether the witness' identification of the defendant had a basis independent of the unduly suggestive identification procedure].  Id.; see also, 409 U.S. at 199-200; Thigpen, 804 F.2d at 895.  Five factors that are considered in assessing the reliability of the identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and the confrontation.  Manson, 432 U.S. at 114; Biggers, 409 U.S. at 199-200.

Id. at 1070-71.  Accord, Mills v. Cason, 572 F.3d 246, 251 (6th Cir. 2009);

United States v. Crozier, 259 F.2d 503 (6th Cir. 2001).  In Howard v. Bouchard,

405 F.3d 459 (6th Cir. 2005), the Sixth Circuit elaborated upon the requirement

that a criminal defendant establish that the identification procedure was unduly

suggestive, writing:

> Unnecessary suggestiveness generally depends "upon whether the witness's attention was directed to a suspect because of police conduct."  2-5 Crim. Con. Law § 5.05(2)(b) (2004).  In considering this, we look to the effects of the circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice the defendant.  Thigpen v. Cory, 804 F.2d 893, 895 (6th Cir. 1986).  In examining whether the identification procedure was impermissibly suggestive, the "primary evil to be avoided is a very substantial likelihood of irreparable misidentification."  Neil [v. Biggers, 409 U.S. 188, 198 (1972)] (citing Simmons v. United States, 390 U.S. 377, 384 (1968)).

Id. at 469-70.  In Mills, the Sixth Circuit noted that "in judging reliability, a court

must consider the totality of the circumstance surrounding the pre-trial

identification, weighed against any corrupting effect of the suggestive

identification."  572 F.3d at 251 (citing Manson v. Brathwaite, 432 U.S. 98

(1977)).  Of course, "each case must be considered on its own facts."  Simmons

v. United States, 390 U.S. 377, 384 (1968).

Prior to the commencement of the oral and evidentiary hearing, this Court

sustained the Government's Motion to Bifurcate the Suppression Hearing

(Doc. #35).  As a result of that ruling, the hearing, as it related to McGuire and

Woods, was limited to the first prong of the analytical framework, i.e., did either or

both of those two Defendants meet his burden of proving that the photo

identification procedure employed by Bergman was unduly suggestive.  Therefore,

with respect to those two Defendants, the Court will decide only that issue herein.

If it concludes that those Defendants have met their burdens of persuasion,

another suppression hearing will be scheduled, during which McGuire and Woods

will be permitted to examine the three victims/witnesses of the home invasion

concerning the reliability prong, a prong on which the Government will have the

burden of proof. With respect to Justice, the Government has conceded that the

"show-up" identification procedure was unduly suggestive; therefore, the issue for

the Court to resolve at this point is whether Brian Pinson's identification of him

was reliable. As a means of analysis, this Court will initially decide whether the

identification procedure utilized with McGuire was unduly suggestive, following

which it will address the same question as it relates to Woods. Finally, the Court

will turn to the issue of whether Brian Pinson's identification of Justice was

reliable.

### 1. McGuire

This Court has found that the photographic array containing the photo of

McGuire was not unduly suggestive. The photographs of the five other individuals

depicted thereon have similar hair length and facial features to McGuire. Four of

the six individuals, including McGuire, are wearing dark shirts. Indeed, McGuire

does not argue that the selection of the five other individuals or the manner in

which they are displayed on the photographic array was unduly suggestive. Nor

does McGuire contend that the manner in which Bergman showed the array to

Brian Pinson and Barnett was unduly suggestive. Indeed, the evidence would not

support such a contention. Rather, McGuire asserts that the suggestive nature of

his identification procedure is demonstrated by the fact that there was a conflict in

the testimony about whether Breonna Pinson was shown the photographic array

containing his (McGuire's) photo. Bergman testified that he showed the array to

Breonna Pinson, who testified that she did not see a photographic array containing

- 11 -

a photo of McGuire.[13]  It bears emphasis, however, that the testimony of two

individuals who identified McGuire from the photographic array, Brian Pinson and

Barnett, was fully consistent with that of Bergman.  Simply stated, this Court is

unable to find that the photographic array containing McGuire's picture was unduly

suggestive, merely because one of the witnesses to the home invasion forgot or

denied that she had been shown a picture of that Defendant.

In addition, McGuire argues that the unduly suggestive nature of the

identification procedure involving him is demonstrated by Bergman's failure to

follow the procedures set forth in § 2933.83 of the Ohio Revised Code, which sets

forth minimum requirements for lineups and photo identification procedures under

Ohio law.  Among its other provisions, that statutory provision requires that the

person administering a photo lineup be blinded, i.e., he or she not know which

person pictured in the photographic array is the suspect.  See Ohio Rev. Code

§ 2933.83(B)(1).  Since § 2933.83 did not become effective until July 6, 2010,

nearly 16 months after Bergman showed the photographic array containing

McGuire's picture to Brian Pinson and Barnett, that statutory provision is not

applicable herein.[14]  Indeed, McGuire concedes that compliance with § 2933.83 is

_____

[13]The Court has credited Bergman's testimony in that regard, because he was a police officer trained to note the steps he had taken during the investigation he was conducting.

[14]Moreover, it is axiomatic that "federal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law."  United States v. Bach, 310 F.3d 1063, 1066 (8th Cir. 2002), cert. denied, 538 U.S. 993 (2003).  See also United States v. Wright, 16 F.3d 1429, 1437 (6th Cir. 1994) (noting that, due to the fact that the exclusionary rule addresses constitutional violations, "[t]he fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended").

- 12 -

not required in this matter; however, McGuire argues that this Court should find

that the identification procedure used with him was unduly suggestive, because it

failed to comply with the statute.  According to McGuire, statutes like § 2933.83

were adopted because of the inherent suggestiveness of non-blinded photo

identification procedures and the difficulty of proving that such a procedure was

unduly suggestive.  Doc. #63 at 5-6.  It is within the province of the legislative

branch, rather than this Court, to adopt regulations for photo lineups.  This Court's

role is limited to determining whether any of the procedures utilized herein violated

the Due Process Clause of the Fifth Amendment.  In order to establish such a

violation, the defendant must prove that the procedure utilized was unduly

suggestive.  Ledbetter, supra.  Since McGuire has not remotely met his burden of

proof in that regard, this Court cannot suppress his identification by Brian Pinson

and Barnett, regardless of whether there were better procedures, such as using a

blinded administrator, available.

Accordingly, the Court overrules McGuire's Motion to Suppress Identification

Testimony (Doc. #28).


## 2.  Woods

To support his overall position that the photo spread used to identify him

was unduly suggestive, Woods has focused both on the makeup of the

photographic array and the manner in which the photo spread was shown to the

three victims of the home invasion.  The Court will address those two arguments in

the above order, the identical order in which they appear in Woods' post-hearing

memorandum (Doc. #62).

Woods initially contends that Bergman put together the photo spread containing his photograph in an unduly suggestive manner.  In support thereof, he points out that his photo in the array shows him wearing a dark shirt and asserts that three of the five other individuals shown on the array are wearing light shirts.[15] During the hearing, Bergman testified that the witnesses indicated that the victims of the home invasion described perpetrators as wearing dark or black clothing.

This Court cannot agree with Woods that the color of the shirt he was wearing when his mug shot was taken renders the makeup of the photographic array containing his photo unduly suggestive.  Two of the other individuals shown thereon are also wearing black shirts, and two more are wearing gray shirts.  Moreover, it bears emphasis that the three victims of the home invasion, Brian Pinson, Barnett and Breonna Pinson, viewed the photo spread containing Woods' photograph more than ten months after the crime had been committed.  Given that such an amount of time had passed, the witnesses were less likely to focus on the color of the shirts worn by the six individuals shown in the array.  Therefore, the fact that Woods' picture on the array showed him wearing a black shirt does not cause the Court to conclude that the identification procedure was unduly suggestive.

In addition, Woods contends that, on his photo, his head is closer to the upper margin of the photo than the heads of the others shown on the other five photographs and that his face appears to be larger and closer to the camera than the faces of the other five individuals shown on the array.  As a result, Woods'

---

[15]In actuality, one of the others shown in the array is wearing a white shirt; two are wearing black shirts, and the other two are wearing what might best be described as gray shirts.

argument continues, a person viewing the array would be drawn to his photograph. Woods' face does appear to take up more space in his photograph than those of the other individuals pictured on the array.  However, while Woods' head is closer to the upper margin of his photograph, than the heads of the other individuals, some of their heads are closer to a side margins of their respective photographs than is Woods' head.  On Woods' photo, his head is close to the right side margin, but very far removed from the left side of the photograph, because his head appears to be tilted.  The heads of the individuals shown in photos one and four are also close to the right side margins of their respective photographs, yet closer to the left side margins than is Woods' head.  Given that these alleged shortcomings with the photo spread in this regard are not unique to Woods, this Court is unable to find that the size of Woods' head on the photograph and its closeness to one of the margins render the photo array unduly suggestive. Moreover, after throughly examining the photo array containing Woods' photograph, this Court cannot find that any minuscule difference between that photo and the other five shown on the spread causes the identification procedure to be unduly suggestive.

As is indicated above, Woods also asserts that the photo array was unduly suggestive, because of the manner in which it was displayed.  In particular, Woods focuses on the fact that Brian Pinson testified that, before police showed him the photo array, they called him to inform him that they were going to come to his residence to meet with him and that they had some leads.  According to Woods, this made Brian Pinson expect that someone linked to the home invasion was in the photo spread.  This Court is unable to agree with Woods that the actions of police

- **15** -

in that regard rendered the procedure unduly suggestive.  It is fanciful to believe that Brian Pinson would have thought differently if police had not told him that they had some leads.  It defies credulity to believe that police would have traveled to the residence of a victim of a crime some ten months after its commission, in order to show the victim a photo spread containing photographs of six individuals, none of whom was suspected of having been involved in the offense.[16]

Additionally, Woods contends that the undue suggestiveness of the manner in which the photo spread was shown to Brian Pinson, Barnett and Breonna Pinson is demonstrated by fact that the three victims were shown identical arrays on different days.  Brian Pinson was shown the photo spread on January 19, 2010, while Barnett and Breonna Pinson were shown it, respectively, on January 26th and 27th.  While the decision to show the three victims the photographic array on different days may have made it more likely that the process would be unduly suggestive, given that such a procedure increases the time during which a victim who has been shown the array can discuss the matter with a victim who has yet to view it, this Court is unable to agree with Woods that, under the facts of this prosecution, the procedure utilized was unduly suggestive.  In United States v. Stamper, 91 Fed. Appx. 445, 461-62 (6th Cir. 2004), the Sixth Circuit concluded that showing the same array to two witnesses, two days apart, did not result in the procedure being unduly suggestive, given that the first witness to be shown

---

[16]Barnett testified that she was told, probably by Brian Pinson, who spoke with police the day they came to her residence to show her the photo spread containing Woods' picture, that officers were coming to her residence in order to show her that spread.  This does not cause this Court to find that the manner in which the photo spread was shown to her was unduly suggestive.  It was inevitable that Barnett would be informed by someone that she was going to be shown a photo spread before it was shown to her.

the photo spread did not discuss the matter with the second witness.  Similarly, herein, Brian Pinson, Barnett and Breonna Pinson did not discuss the photo spread containing Woods' photograph at any time before all had been shown that array. Indeed, Bergman admonished the three victims not to discuss the photo spread with the others.  There is no evidence, whatsoever, that any one of them violated these instructions.  Therefore, this Court cannot find that Woods has met his burden of establishing that the photo spread containing his photograph was unduly suggestive, because it was shown to the victims of the home invasion on different days.

Accordingly, the Court overrules Woods' Motion to Suppress Identification Testimony (Doc. #32), the Defendant Woods having failed to meet his burden of proof that the process of identification was unduly suggestive.


3.  Justice

As is indicated above, the Government has conceded for present purposes that the showup used to identify Justice was unduly suggestive.  Therefore, in ruling on his request to suppress identification testimony, the Court need only decide whether Brian Pinson's identification of Justice was reliable.  As is indicated above, the Sixth Circuit held in Ledbetter that "[f]ive factors that are considered in assessing the reliability of the identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and

- 17 -

the confrontation." 35 F.3d at 1071.  Of course, a court must consider the totality of the circumstances when deciding whether an identification was reliable.  Neal v. Biggers, 409 U.S. 188, 199-200 (1972).  An application of those factors causes this Court to conclude that Brian Pinson's identification of Justice was reliable, the Government having met its burden of proof in that regard.

First, Brian Pinson was able to see Justice on three occasions on March 17, 2009, the night of the home invasion, prior to his making the identification, to wit: on the front steps to his residence; when Justice walked down the stairs with Barnett; and when Justice was in the front doorway of the residence after Brian Pinson and his children had left that dwelling.  Accordingly, the Court concludes that the first factor weighs strongly in favor of finding the identification to have been reliable.

Second, the evidence would support neither a finding that Brian Pinson paid particular attention to the home invaders, nor that he failed to examine them carefully.  The record is silent on that factor.  Therefore, the second factor is neutral.

Third, the third factor is similarly neutral, given that there is no evidence that Brian Pinson provided a description of Justice, before he (Brian Pinson) was asked to identify him.

Fourth, since the evidence would not support a finding on the level of Brian Pinson's certainty about his identification of Justice, this factor is neutral.

Fifth, given that Brian Pinson identified Justice less than an hour after the home invasion, this factor favors a finding that the identification was reliable.

- 18 -

In sum, this Court has found that three of the five factors are neutral, while the other two favor a finding that Brian Pinson's identification of Justice on March 17, 2009, was reliable.  Under those circumstances, this Court concludes that the Government has sustained its burden of proof that Brian Pinson's identification of Justice was reliable.  Accordingly, the Court overrules Justice's Motion to Suppress Identification Testimony (Doc. #53).

Based upon all of the foregoing, the Court overrules McGuire's Motion to Suppress Identification Testimony (Doc. #28), Woods' Motion to Suppress Identification Testimony (Doc. #32) and Justice's Motion to Suppress Identification Testimony (Doc. #53).

February 14, 2011

WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.